IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BERNARD EDWARD KING | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:12-cv-169-TFM |
| | ) | [wo] |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Bernard Edward King ("Plaintiff" or "King") applied for supplemental security income under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g), 1383(c)(3), on October 26, 2009. Tr. 22. After being denied on January 21, 2010, King timely filed for and received a hearing before an administrative law judge ("ALJ") who rendered an unfavorable decision on June 16, 2011. Tr. 22, 33. King subsequently petitioned for review to the Appeals Council who rejected review of King's case on January 10, 2012. Tr. 1. As a result, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner"). *Id.* Judicial review proceeds pursuant to 42 U.S.C. § 405(g), and 28 U.S.C. § 636(c). After careful scrutiny of the record and briefs, for reasons herein explained, the Court AFFIRMS the Commissioner's decision.

### I. NATURE OF THE CASE

King seeks judicial review of the Commissioner's decision denying his application

for supplemental security income benefits.  United States District Courts may conduct limited review of such decisions to determine whether they comply with applicable law and are supported by substantial evidence.  42 U.S.C. § 405.  The court may affirm, reverse and remand with instructions, or reverse and render a judgment.  *Id*.

## II. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is a limited one.  The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied.  *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'"  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)).  Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence.  *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Foote*, 67 F.3d at 1560 (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district

court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).   The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560 (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).   The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth*, 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   There is no presumption that the Commissioner's conclusions of law are valid. *Id.*; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

## III.  STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement,

provided they are both insured and disabled, regardless of indigence.[1]  *See* 42 U.S.C. §
423(a).  The Social Security Act's Supplemental Security Income ("SSI") is a separate
and distinct program.  SSI is a general public assistance measure providing an additional
resource to the aged, blind, and disabled to assure that their income does not fall below
the poverty line.[2]  Eligibility for SSI is based upon proof of indigence and disability.  *See*
42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  However, despite the fact they are separate
programs, the law and regulations governing a claim for DIB and a claim for SSI are
identical; therefore, claims for DIB and SSI are treated identically for the purpose of
determining whether a claimant is disabled.  *Patterson v. Bowen*, 799 F.2d 1455, 1456 n.
1 (11th Cir. 1986).  Applicants under DIB and SSI must provide "disability" within the
meaning of the Social Security Act which defines disability in virtually identical language
for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§
404.1505(a), 416.905(a).  A person is entitled to disability benefits when the person is
unable to

> Engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result
> in death or which has lasted or can be expected to last for a continuous
> period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is one
resulting from anatomical, physiological, or psychological abnormalities which are

---

[1] DIB is authorized by Title II of the Social Security Act, and is funded by Social Security taxes.
*See* Social Security Administration, Social Security Handbook, § 136.1, *available at*
http://www.ssa.gov/OP_Home/handbook/handbook.html
[2] SSI benefits are authorized by Title XVI of the Social Security Act and are funded by general
tax revenues.  *See* Social Security Administration, Social Security Handbook, §§ 136.2, 2100,
*available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004).  Claimants establish a prima facie case of qualifying disability once they meet the burden of proof from Step 1 through Step 4.  At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform.  *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

Residual Functional Capacity (RFC). *Id*. at 1238-39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id*. It also can contain both exertional and nonexertional limitations. *Id*. at 1242-43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id*. at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines[4] ("grids") or hear testimony from a vocational expert (VE). *Id*. at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. *Id.* at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." *Id*.

### IV. ADMINISTRATIVE FINDINGS AND CONCLUSIONS

King, age 48 at the time of the hearing, has completed the 12th grade, but claims to have trouble reading and writing complicated words. Tr. 46, 48. King has past relevant work as a truss assembler (semi-skilled, medium), warehouse laborer (unskilled, medium), sanitation worker (unskilled, heavy), janitor (unskilled, medium), and brick mason helper (unskilled, heavy). Tr. 31. King's alleged disability onset date is May 9, 2009. Tr. 22. King has not engaged in substantial gainful work activity since his

---

[4] *See* 20 C.F.R. pt. 404 subpt. P, app. 2; *see also* 20 C.F.R. § 416.969 (use of the grids in SSI cases).

application date of October 26, 2009.  Tr. 24.  The record is insufficient to determine if King meets the insured status requirements of the Social Security Act.  King claims he is unable to work because of pain in his knees, back, and hands, as well as depression and anxiety.  Tr. 52.

King received treatment from various medical practitioners and the ALJ considered the medical records from each.  On March 30, 2009, King was seen by Dr. Harriett Searey, M.D. for knee and hand pain, gastroesophageal reflux disease ("GERD"), hypertension, and anxiety.  Tr. 27, 337.  Dr. Searey instructed King to stop taking Advil, and instead take 1,000mg of Tylenol three times a day to treat his knee pain.  *Id.*  Dr. Searey did not note any abnormalities during King's physical examination.  *Id.*  Dr. Searey noted that King's GERD was currently uncontrolled because King did not have transportation to pick up his Nexium refill, and also that King was out of Lexipro for his anxiety, and prescribed refills for both.  *Id.* King's hypertension was noted as okay.  *Id.* King was advised to increase walking to lose weight.  *Id.*

King returned to Dr. Searey's office on June 24, 2009 for pain in his shoulder, arm, and knee.  Tr. 27, 336.  King reported "mild" pain in his left shoulder, although Dr. Searey did not note any limitations in King's range of motion or any tenderness to palpation.  *Id.*  Dr. Searey told King to take Tylenol as needed for his shoulder pain, and noted that osteoarthritis is the likely cause of his shoulder pain.  *Id.*  Dr. Searey noted that King said he has right hand stiffness "sometimes," but she did not make any further mention of it.  *Id.*  King's hypertension was noted as "good" and his GERD was noted as "stable."  *Id.*  Dr. Searey noted that King has chronic anxiety and proscribed medication.

*Id.*

King's was last seen by Dr. Searey on September 30, 2009 for arm and knee pain. Tr. 28, 335.  Dr. Searey's main concern was with the lipoma on his arm, to which King stated he was afraid it could be cancer.  *Id.*  King told Dr. Searey that he could not afford to go to a surgeon to have the lipoma looked at.  *Id.*  King's hypertension was noted as "fair" and his GERD was noted as "stable."  *Id.*  Dr. Searey once again advised King about losing weight, but it was noted that he had lost weight between each of the past two visits.  Tr. 335-36.

On January 18, 2010, King was examined by Dr. Randall Jordan, Psy.D. who completed a Report for the Disability Determination Service Unit.  Tr. 30, 390-92.  King reported that he has "worn out worker's syndrome."  Tr. 390.  Dr. Jordan found King to be neatly groomed and of good hygiene.  Tr. 391.  Dr. Jordan noted that there "were no unusual fine or gross motor anomalies or gestures other than slow ambulation using a cane."  *Id.*  Dr. Jordan found that King's speech was "understandable 100% and did not reflect pressured processes."  *Id.*  Dr. Jordan noted that King demonstrated intact concentration abilities, that his memory for short-term auditory tasks was not compromised, that his long-term memory is generally intact, that his fund of information is "somewhat below average,", and that his abstractions were "somewhat concrete."  *Id.* Overall, Dr. Randall estimated King's intelligence to be in the Borderline to Low Average range.  *Id.*  Dr. Jordan found that King's thought processes "revealed no loose associations or tangential thoughts," and that King did not suffer from paranoid delusions, auditory or visual hallucinations, or suicidal or homicidal ideations.  *Id.*  Dr. Jordan stated

that King's activities of daily living such as general cleaning, cooking light meals, bathing, and grooming are not compromised by his intellectual function.  *Id.*  Dr. Jordan's impressions are depressive disorder NOS, borderline intellectual functioning, and chronic pain.  *Id.*  However, Dr. Jordan noted that King can function independently; his ability to carry out and remember simple, one-step instructions is not compromised; and his ability to respond well to coworkers, supervisors, and everyday work pressures is not compromised due to psychiatric issues.  Tr. 392.

On January 20, 2010, Dr. Ellen N. Eno, Ph.D. completed a mental RFC assessment for King.  Tr. 31, 393-409.  Dr. Eno noted that King suffers from a medically determinable impairment of Depressive Disorder NOS.  Tr. 396.  Dr. Eno found that King has a mild degree of limitations in "Restrictions of Activities of Daily Living" and "Difficulties in Maintaining Social Functioning," moderate degree of limitation in "Difficulties in Maintaining Concentration, Persistence, or Pace," and no degree of limitation in "Episodes of Decompensation."  Tr. 403.  Dr. Eno indicated that the evidence does not establish the presence of paragraph "C" criteria.  Tr. 404.  Consistent with Dr. Jordan's findings, Dr. Eno found King is moderately limited in the following areas: ability to understand and remember very short and simple instructions, ability to carry out detailed instructions, and ability to maintain attention and concentration for extended periods. Tr. 31, 407.  All other processes were marked as "Not Significantly Limited."  Tr. 407-08.

On July 27, 2010, King sought treatment at SpectraCare Health Systems, Inc. for mental health issues, and received an intake evaluation.  Tr. 441-58.  Dr. June Johnson,

L.P.C. found that King needed treatment for depression, anxiety, bereavement, and fears/phobias, discussed her findings with King and set goals to help him manage each symptom. *Id.* King attended numerous group and individual therapy session where King continually reported full compliance and no problems with his medication, and regularly reported no suicidal or homicidal ideations. Tr. 463-68. In King's January 13 and 27, 2011 sessions he reported that he was only taking half pills of his medication because he initially had financial troubles, and then subsequently had to wait for his brother to pick up his refills. Tr. 460-61.

On March 15, 2011, King saw Dr. Benjamin F. Thompson, Jr. D.C. complaining of "intermittent low back pain described as burning, cramping, sore, tight, stiff, and sometimes sharp on movement" as well as "bilateral knee pain." Tr. 431. Dr. Thompson found that there "is a decrease in lumbar ranges of motion 4 degrees in flexion, 20 degrees in extension, 20 degrees in bilateral lateral lumbar flexion and lumbar rotation at 30 degrees in left rotation and about 20 degrees in right rotation." *Id.* King reported knee pain during a toe walk, showed a positive Soto Hall test, positive kemps maneuver, positive straight leg raise bilaterally but described as hamstring discomfort, but the Waddell tests were negative "indicating this patient is a good witness for his condition." *Id.* Dr. Thompson noted that no back pain was reported on the dorsi flexion of the feet. *Id.* Dr. Thompson found that x-rays of King's lumbar spine did not reveal "any significant low back condition," and opined that King's lower back condition is related to his chronic knee pain and once his knee pain is resolved his lower back problems should improve. *Id.*

After review of the medical record, the ALJ found the described impairments of degenerative joint disease of the knees, osteoarthritis of the shoulder, low back pain, hypertension, GERD, depressive disorder, borderline intellectual functioning, and generalized anxiety disorder limit King's ability to perform a full range of exertional work-related activities, and are severe within the definition of the Act.  Tr. 24.  The ALJ found that King "has the residual functional capacity to perform less than the full range of light work," with the following limitations:

> he can stand and walk no more than two hours in an 8-hour workday.  He can perform frequent handling.  He can no more than occasionally operate foot controls, bend, or balance.  He cannot kneel, crawl, or climb ladders, scaffolds, or ropes.  He cannot work around unprotected heights or dangerous equipment.  He is limited to short , simple tasks and 1-2 step job tasks.  He must avoid all complex or detailed job instructions or tasks.  He cannot work in crowds. He can have no more than occasional contact in the public.  He is limited to minimal changes in work settings and routines.  He is limited to making judgments on simple, work-related decisions.

Tr. 26.  The ALJ found that King is unable to perform any past relevant work.  Tr. 31. The ALJ then found that considering King's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that King can perform."  Tr. 32.

## V. Issues

King raises three issues for judicial review:

(1) Whether the ALJ erred in finding Mr. King capable of light work while at the same time finding he can only stand or walk for no more than two hours in an 8-hour workday;

(2) Whether the ALJ erred in forming her RFC assessment despite the record being

devoid of any physical RFC assessments completed by a physician; and

(3) Whether the ALJ erred in failing to consider whether King's obesity was a severe impairment.

*See* Doc. 11 at 3-4.

## VI.   DISCUSSION

### A.   The ALJ properly found King is capable of performing less than the full range of light work accompanied by enumerated limitations.

King argues that the "Commissioner's decision should be reversed because the ALJ erred in finding Mr. King capable of light work activity while at the same time finding he can only stand or walk for 2 hours during an 8-hour day." *See* Doc. 11 at 4. Specifically, King argues that the ALJ's determination that he can only stand or walk for two hours during an eight-hour day is inconsistent with being able capable of performing light work, and that the ALJ failed to evaluate whether or not he requires the use of an ambulatory device. *See* Doc. 11 at 4, 8. The government responded that King's arguments should be rejected because there is substantial evidence that supports the ALJ's finding that King can perform a range of unskilled light work with limitations, and that there is no evidence presented in the record that King is required to use a cane. *See* Doc. 14 at 8-9.

First, King asserts that the ALJ's finding that King can only stand two hours in an eight-hour day conflicts with her RFC assessment that King is capable of performing light work activity. *See* Doc. 11 at 4. The ALJ found that King "has the residual functional capacity to perform less than the full range of light work," and specified several

limitations that she found to be consistent with King's RFC including that King "can stand and walk no more than two hours in an 8-hour workday." Tr. 26. Light work is defined as:

> Light work. The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.
>
> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

SSR 83-10.

King emphasizes that the definition of light work states "a job is in this category when it requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs." *See* Doc. 11 at 5. However, King's argument fails because he has neglected to put that statement in its full context. The regulation subsequently states that "[a] job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which

require greater exertion than in sedentary work."  The ALJ clearly stated that he has found that King is capable of performing "*less than the full range* of light work."  Tr. 26 (emphasis added).  The ALJ limited King to standing and walking no more than two hours in an eight-hour workday, and no more than occasionally operating foot controls, bending, or balancing; however, she noted no limitation on performing frequent handling tasks.  *Id.*

Further, the VE testified that given King's age, education, work experience, and RFC as set forth by the ALJ, King "would be able to perform the requirements of representative occupations such as bench assembler (DOT No. 713.687-018) [. . .], lens inserter (DOT No. 713.687-026) [. . .], and hand packager (DOT No. 789.687-174).  Tr. 32.  The VE testified that all three of the positions listed are all sedentary jobs.  Sedentary work is defined as:

> Sedentary work. The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, *periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday*. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10 (emphasis added).  The three sedentary positions that the VE testified King is

capable of performing are clearly consistent with the VE's RFC assessment that King should not stand or walk more than two hours in an eight-hour workday.  The ALJ found that King can perform less than the full range of light work which involves jobs that require sitting most of the time, but may require greater exertion than in sedentary work.  The ALJ's RFC assessment of less than a full range of light work is both consistent with the limitations the ALJ placed upon King, as well as the jobs that the VE testified that King is capable of performing.

Next, King argues that he testified that he has to use a cane "every day for the last couple of years."  *See* Doc. 11 at 8.  King asserts that the ALJ failed to address this testimony, and also failed to evaluate whether King requires the use of an abulatory device.  *Id.*  King cited to Social Security Rulings that state the use of an ambulatory device may impact a claimant's ability to perform light or sedentary work.  *See* Doc. 11 at 7 (citing SSR 96-9p; 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.00(J)(4)).  King's argument fails because the ALJ did in fact address King's testimony regarding his use of a cane.  The ALJ stated that King testified that he uses a cane daily, but noted that King admitted that the cane was not prescribed by a medical professional.  Tr. 27.  The ALJ again mentioned King's use of the cane while discussing King's inconsistent statements that undermine his credibility.  Tr. 28.  There is not a single mention in King's medical records which states that he is required to use a cane or any other ambulatory device.  The burden of proving disability is on the claimant.  *Jones*, 190 F.3d at 1228 (citing 20 C.F.R. § 416.912 (1998)); *see also Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  King failed to present any evidence as to whether or not he requires the use of an

ambulatory device; mere testimony of its usefulness does not rise to the level of sufficient objective medical evidence.

## B.    The ALJ properly formed a RFC assessment without a physician's physical RFC assessment in the record.

King argues that "the Commissioner's decision should be reversed because there is absolutely no support for the ALJ's RFC assessment as the record is devoid of any physical RFC assessment from any physicians whatsoever." *See* Doc. 11 at 8.   The Government responded that "Plaintiff's argument is without merit" because "[t]he agency's regulations and rulings make clear that it is the ALJ's responsibility, not the responsibility of a physician, to assess a claimant's residual functional capacity." *See* Doc. 14 at 11.

"After careful consideration of the entire record," the ALJ found that:

> the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 416.967(b). Specifically, he can stand and walk no more than two hours in an 8-hour workday. He can perform frequent handling. He can no more than occasionally operate foot controls, bend, or balance. He cannot kneel, crawl, or climb ladders, scaffolds, or ropes. He cannot work around unprotected heights or dangerous equipment. He is limited to short, simple tasks and 1-2 step job tasks. He must avoid all complex or detailed job instructions or tasks. He cannot work in crowds. He can have no more than occasional contact in the public. He is limited to minimal changes in work settings and routines. He is limited to making judgments on simple, work-related decisions.

Tr. 26. At this point in the five-step, sequential evaluation the burden is on the claimant to prove that she is disabled. *Jones*, 190 F.3d at 1228 (citing 20 C.F.R. § 416.912 (1998)); *see also Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). "At the fourth step, the ALJ must assess: (1) the claimant's residual functional capacity ("RFC");

and (2) the claimant's ability to return to her past relevant work. *Phillips*, 357 F.3d at 1238 (citing 20 C.F.R. § 404.1520(a)(4)(iv)). To determine the claimant's RFC, the ALJ "must determine if the claimant is limited to a particular work level." *Id.* To be deemed capable of performing light work, the claimant must have the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and be able to do "a good deal of walking or standing, [able to be] sitting most of the time, [and able to do] some pushing and pulling of arm or leg controls." 20 C.F.R § 404.1567(b). "Although a claimant may provide a statement containing a physician's opinion of her remaining capabilities, the ALJ will evaluate such a statement in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ." *Green v. Soc. Sec. Admin.*, 223 F. App'x 915, 923 (11th Cir. 2007) (citing 20 C.F.R §§ 404.1513, 404.1527, 404.1545).

In *Green*, the ALJ discredited the only physician RFC assessment that was in the record, and the plaintiff argued that the ALJ lacked substantial evidence to base his RFC assessment without a physician's RFC. *Id.* The Eleventh Circuit stated that even without considering a physician's RFC assessment, the record indicated that she was managing her impairments well, and her symptoms were controlled. *Id.* at 923-24. As a result, the Eleventh Circuit found that "substantial evidence supports the ALJ's determination that Green could perform light work." *Id.* at 924. Similarly, in *Griffin v. Astrue*, the plaintiff argued that a physician's RFC assessment was required. 2008 WL 4417228, *9 (S.D. Ala. Sept. 23, 2008). The court found that despite not having a physician's RFC, the ALJ's RFC was "supported by the claimant's treating physicians, as well as the absence

of functional limitations placed on the claimant by any medical source." *Id.* at *10. The court noted that "[w]hile Plaintiff asserts that a physician's RFC assessment was required, she has not demonstrated that the ALJ did not have enough information to enable him to make a RFC determination, nor has she pointed to any medical evidence which suggests that the ALJ's RFC assessment is incorrect." *Id.* The court ultimately held that "substantial evidence supports the ALJ's determination that Plaintiff possesses the RFC to perform light work" because the medical records demonstrated that despite having severe impairments, her condition was stable and controlled with medication. *Id.* The court also found that the medical records did not reveal any evidence of functional limitations, and none of the plaintiff's physicians limited her activities. *Id.*

After review of the ALJ's opinion, it is clear to this Court that the ALJ carefully considered the medical evidence in the record when determining King's RFC. The Court recognizes that the record lacks a physical RFC assessment completed by a physician. A RFC assessment is used to determine the claimant's capacity to do as much as they are possibly able to do despite their limitations. *See* 20 C.F.R. § 404.1545(a)(1) (2010). An RFC assessment will be made based on all relevant evidence in the case record. *Id.*; *Lewis*, 125 F.3d at 1440. At an ALJ hearing, "the [ALJ] is responsible for assessing [the claimant's] residual functional capacity." 20 C.F.R. § 404.1546(c) (2010). The claimant is "responsible for providing the evidence [the ALJ] will use to make a finding about [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545(a)(3) (2010). The ALJ is "responsible for developing [the claimant's] complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable

effort to help [the claimant] get medical reports from [their] own medical sources.  *Id.;  Holladay v. Bowen,* 848 F.2d 1206, 1209-10 (11th Cir. 1988).  "The ALJ is not required to seek additional independent expert medical testimony before making a disability determination if the record is sufficient and additional expert testimony is not necessary for an informed decision."  *Nation v. Barnhart*, 153 Fed. Appx. 597, 598 (11th Cir. 2005) (citing *Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999)); *see also Griffin*, 2008 WL 4417228, at *10 (citing 20 C.F.R. § 416.912(d)) ("The ALJ is bound to make every reasonable effort to obtain all the medical evidence necessary to make a determination [. . .]; however, he is not charged with making Plaintiff's case for her").  As previously stated, King "has the burden of proving that [he] is disabled."  *Id.* (citing 20 C.F.R. § 416.912(a) and (c); *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  The lack of a physician's RFC assessment in the record falls upon the claimant; the duty to obtain sufficient medical records to make a disability determination falls upon the ALJ.

Here, the ALJ found that King suffers from the following severe combination of impairments: "degenerative joint disease of the knees, osteoarthritis of the shoulder, low back pain, hypertension, [GERD], depressive disorder, borderline intellectual functioning, and generalized anxiety disorder."[5]  Tr. 24.  However, the ALJ determined that King "has not generally received the type of medical treatment one would expect for a totally disabled individual."  Tr. 27.  The ALJ determined that King's pain medication is limited to Aleve, Tylenol, and Motrin, and his "only other method of pain relief is propping his

---

[5] King only takes issue with the lack of a physical RFC assessment completed by a physician, because a mental RFC assessment was completed by a physician. Therefore, the severe impairments of depressive disorder, borderline intellectual functioning, and generalized anxiety disorder will not be discussed within this issue.

legs up in his recliner while he sleeps." Tr. 27. The ALJ also noted that King has been counseled on several occasions to increase his exercise and to continue to walk to address his weight. *Id.*

The ALJ found that "[c]linical findings provide some support for the claimant's pain complaints but are inconsistent with an inability to perform any sustained work." *Id.* The ALJ made specific note of King's February 1, 2008 x-ray completed by his treating physician that found King's "right knee showed medial joint space narrowing and tibial end plate sclerosis, 'both consistent with changes of osteoarthritis.'" *Id.* The ALJ noted that on June 24, 2009, King only reported "mild pain in his left shoulder, but no limitations in range of motion or tenderness to palpation were noted." *Id.* The ALJ reviewed King's record from October 15, 2009 in which an examination revealed no abnormalities with King's musculoskeletal and neurologic systems. Tr. 27-28. King's "back was normal to inspection; his extremities were non-tender with a normal range of motion; his motor exam was normal; and his sensation was normal." Tr. 28. The ALJ also found support for King's pain symptoms from his March 15, 2011 visit where King exhibited decreased lumbar range of motion; he reported knee pain during toe walk; and Kemps Maneuver and Soto Hall tests were positive. However, x-rays of King's lumbar spine "did not reveal any significant low back condition, and although King's straight leg test was noted as positive, King only described hamstring discomfort." *Id.*

The ALJ also noted that King has made several inconsistent statements that undermine his credibility with regards to the disabling level of his impairments. *Id.* King testified that Dr. Thompson recommended knee surgery in March 2011; however, the

only mention of knee surgery in the record was Dr. Thompson stating that "[a]ccording to the patient, he has had a doctor recommend knee surgery." *Id.*  Similarly, King testified that he can walk no more than 25 yards to and from his house, and that he can stand no longer than thirty minutes before needing to sit down; however, therapy progress notes dated February, 24, 2011, show that King went "outside to walk and get fresh air for two hours and that helped." *Id.*  A similar note on March 10, 2011, reported that King went outside for a walk. *Id.*  The ALJ also noted that King's "failure to describe symptoms during his infrequent medical treatment contradict his allegations of ongoing, disabling symptoms related to his hands." *Id.*  During a March 30, 2009 visit, King reported hand pain; however on June 24, 2009, King's symptoms were limited to right hand stiffness "sometimes," and on September 30, 2009, October 16, 2009, and March 15, 2011, there were no reports of hand pain at all. *Id.*  The ALJ noted that there "is no record of clinical findings that substantiate his allegations of limited hand use." *Id.*

Finally, the ALJ noted that King has been prescribed appropriate medications for his hypertension and GERD, and King's compliance weighs in his favor. *Id.*  However, the ALJ noted that King's medications are effective in controlling King's symptoms for both his hypertension and GERD.  Throughout the record King's hypertension has been noted as "ok," "good," and his blood pressure was consistently within the normal range. Tr. 28-29.  On most of his visits, King's GERD was either reported as "stable," "fair," or it was noted that King denied gastrointestinal symptoms; however, king's GERD was noted as uncontrolled during one visit due to him being out of medication, to which he was given a refill.  *Id.*  The only other incident involving King's GERD was an

emergency room visit on October 16, 2009 due to abdominal pain.  Lab work returned normal, and a CT scan showed no acute process.  Tr. 29.  The ALJ noted that "the record contains no subsequent indications of any exacerbations of his abdominal symptoms."  *Id.*

The ALJ is responsible for determining King's RFC, not a physician.  Had King received an assessment by a physician, the ALJ would have been required to consider that assessment in making her determination.  "Even though Social Security courts are inquisitorial, not adversarial, in nature, claimants must establish that they are eligible for benefits.  The [ALJ] has a duty to develop the record where appropriate but is not required to order [additional evidence] as long as the record contains sufficient evidence for the [ALJ] to make an informed decision."  *Ingram v. Comm'r of Soc. Sec. Admin.,* 496 F.3d 1253, 1269 (11th Cir. 2007) (citing *Doughty v. Apfel*, 245 F.3d 1274, 1281 (11th Cir. 2001)).  Thus King did not meet his responsibility to provide the evidence he wanted the ALJ to use in making her determination.  It is clear to this Court that the ALJ carefully considered the medical evidence in the record in determining King's RFC, and the record contained sufficient evidence for the ALJ to make her decision.  Therefore, the Court finds that the ALJ's findings are supported by substantial evidence.

**C.    The ALJ does not have a duty to consider an impairment that was not alleged.**

King argues that the ALJ's decision should be reversed because she failed "to consider whether Mr. King's obesity was a severe impairment."  *See* Doc. 11 at 11. Specifically, King argues that he testified that his weight was 330 pounds during the March 17, 2011 hearing before the ALJ, and 318 pounds at the time of the March 30, 2009 hearing.  *Id.*  Similarly, King argues that his weight was recorded as 249 pounds on

November 2, 2007; 302 pounds in February of 2008; and 305 pounds in September of 2009.  *Id.*  Taking into account King's height, his weight would indicate a BMI of 45 according to the National Institutes of Health.  *Id.*  King asserts that "[d]espite these objective findings throughout the record, the ALJ failed to find that Mr. King's obesity was a severe impairment and failed to adequately consider the limitations imposed by this chronic disease."  *See* Doc. 11 at 12.  The Government responds that King, "who was represented by counsel, did not allege that his obesity was a severe impairment."  *See* Doc. 14 at 13.

A physical or mental impairment is defined as "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(c).  The plaintiff has the "burden of showing that his impairments are 'severe' within the meaning of the Act."  *McDaniel*, 800 F.2d at 1030-31.  Once the plaintiff establishes that she suffers from a severe impairment, the ALJ is not entitled to ignore that evidence.

Here, King has never raised obesity as a severe impairment that limits his ability to work prior to raising the issue in the instant action.  King points to testimony in which the ALJ asked King for his height and weight during initial questioning to elicit standard information from the claimant; however, at no time during either hearing did King or his counsel represent to the ALJ that obesity was one of King's severe impairments, or even mention that obesity limits King's activity in any way.

While receiving treatment with Dr. Searey, she regularly noted King's weight and

the progress he was making.  On December 11, 2008, Dr. Searey noted that King weighed 318 pounds, which was a 69 pound gain since his previous weight check on November 2, 2007.  Tr. 340.  On January 7, 2009, Dr. Searey noted King's weight to be at 313 pounds and that he had lost 5 pounds.  Tr. 339.  On February 18, 2009, King weighed in at 314 pounds.  Tr. 338.  Dr. Searey noted the 1 pound gain and advised King to increase his exercise.  *Id.*  On March 30, 2009, Dr. Searey noted that King had lost 3 more pounds, but still advised him to increase his exercise level.  Tr. 337.   On June 24, 2009, King lost 6 more pounds and was down to 305 pounds.   Tr. 336. Dr. Searey gave King documentation about obesity, set up a follow up appointment, and advised him to continue walking.  *Id.*  Lastly, on September 30, 2009, King weighed in at 301 pounds, and Dr. Searey simply noted his 4 pound loss.  Tr. 335.

King has failed to meet his burden of establishing obesity as a severe impairment. The record is completely devoid of any assertion that King or his counsel sought to establish obesity as severe impairment or even mention it as having limiting effects on his ability to work.   There are no "objective findings throughout the record" to establish obesity as a "severe impairment" or "limitations imposed by this chronic disease" as King asserts.  *See* Doc. 11 at 12.  Similarly, Dr. Searey did not impose any limitations on King due to his obesity, in fact, she actually advised King to do the exact opposite; to be more active by increasing his exercising and walking.  Therefore, the ALJ did not err in failing to consider King's obesity, where King failed to meet his burden of establishing obesity as a severe impairment.

## VII. Conclusion

Pursuant to the findings and conclusions detailed in this Memorandum Opinion, the Court concludes that the ALJ's non-disability determination is supported by substantial evidence and proper application of the law. It is, therefore, **ORDERED** that the decision of the Commissioner is **AFFIRMED.** A separate judgment is entered herewith.

DONE this 17th day of May, 2013.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE